UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRANK SALAS,

        Plaintiff,                                                  Hon. Paul L. Maloney

v.                                                                                   Case No. 1:12-CV-314

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 39 years of age on his alleged disability onset date. (Tr. 122-23). He possesses a "limited" education and worked previously as a forklift operator and oil changer. (Tr. 22).

Plaintiff applied for benefits on October 5, 2009, alleging that he had been disabled since October 21, 2007, due to carpal tunnel syndrome, neck pain, and back pain. (Tr. 122-23, 152). Plaintiff's application was denied, after which he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 47-120). On November 3, 2011, the ALJ conducted an hearing at which Plaintiff's counsel and vocational expert appeared. (Tr. 30-44). Plaintiff, however, failed to attend the hearing. In a written decision dated December 8, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 13-24). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 2-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 2009. (Tr. 16); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

3

## RELEVANT MEDICAL HISTORY

On April 7, 2004, Plaintiff participated in an electrodiagnostic examination the results of which revealed evidence of "mild bilateral carpal tunnel compression." (Tr. 340-42).

On October 22, 2007, Plaintiff was examined by Dr. Dan Kreuzer. (Tr. 239-41). Plaintiff reported that he recently injured himself at work after slipping and falling. (Tr. 239). X-rays of Plaintiff's cervical, lumbar, and thoracic spine revealed no evidence of abnormality. (Tr. 264). A CT examination of Plaintiff's head revealed no evidence of intracranial abnormality or skull fracture. (Tr. 265). Plaintiff was diagnosed with a cervical strain and instructed to "use over the counter ibuprofen." (Tr. 239). Dr. Kreuzer reported that Plaintiff could return to work with the following restrictions: (1) "limit repetitive looking up/down" and (2) no lifting greater than ten pounds. (Tr. 235). Following an October 29, 2007 examination of Plaintiff, Dr. Kreuzer reported that Plaintiff could immediately return to "regular duty" work duties. (Tr. 232).

On November 2, 2007, Plaintiff was examined by Dr. Duane Wisk. (Tr. 226-28). Plaintiff reported that he had "a bad headache" and was "still stiff." (Tr. 226). Dr. Wisk instructed Plaintiff to "use over the counter ibuprofen," but limited Plaintiff to "sit down" work. (Tr. 226). On November 9, 2007, Plaintiff participated in a CT examination of his head the results of which revealed "no intracranial abnormality." (Tr. 261). On December 10, 2007, Plaintiff participated in an MRI examination of his cervical spine the results of which revealed "mild" degenerative changes "without central canal stenosis." (Tr. 268-69).

Following a December 18, 2007 examination, Dr. Wisk reported that Plaintiff could return to work with the following limitations: (1) "limit repetitive looking up/down" and (2) no lifting greater than 40 pounds. (Tr. 252). Plaintiff was also instructed to participate in a "home

4

exercise program." (Tr. 252). Dr. Kreuzer reaffirmed these particular instructions and work limitations following a January 10, 2008 examination. (Tr. 249).

On January 22, 2008, Plaintiff was examined by Dr. Wisk. (Tr. 243). Plaintiff reported that he was experiencing "increased pain" and was "here for meds." (Tr. 243). Plaintiff was provided with hydrocodone and again instructed to participate in a "home exercise program." (Tr. 243-44). Dr. Wisk reiterated that Plaintiff could perform work activities subject to the aforementioned limitations. (Tr. 244).

On February 1, 2008, Plaintiff was examined by Dr. Sara Kane-Smart. (Tr. 305-08). Plaintiff reported that he was experiencing neck pain related to a slip and fall accident he experienced at work. (Tr. 305). Plaintiff reported that his "pain is aggravated by everything" and that he obtained "only minor relief with Vicodin." (Tr. 305). Spurling's test[1] was "negative" and the results of a physical examination were otherwise unremarkable. (Tr. 307-08). Plaintiff's medication regimen was modified and he was instructed to participate in physical therapy. (Tr. 308).

Treatment notes dated March 12, 2008, indicate that Plaintiff had attended only "a few visits of therapy" because it "makes him tired." (Tr. 303). Dr. Kane-Smart reiterated to Plaintiff the need for him to participate in physical therapy. (Tr. 304). The doctor further noted that Plaintiff was able to work subject to the following restrictions: (1) no lifting over 30 pounds and (2) minimal bending or extending of the neck. (Tr. 303).

Treatment notes dated April 28, 2008, indicate that Plaintiff was not participating in physical therapy. (Tr. 301). Dr. Kane-Smart summarized the situation as follows:

---

[1] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited August 29, 2013).

> I have reinforced the need for him to have physical therapy. In fact, if he does not attend or take his medications it is really not possible for me to be of any benefit to him. He has some financial constraints, however, if he uses the Holland Hospital site for therapy, they have emergency funding available if his worker's comp does not come through. At this point he is noncompliant with my treatment plan for him. If he takes the initiative to set up appointments with the therapists then I will happily redate the therapy script for him as his would currently be ineffective. I have also explained that had he been attending therapy regularly he would likely not need restrictions for work at this point. Unless he attends therapy I am not going to fill out further work status slips as he is choosing not to try to increase his lifting capabilities. His weakness is not physiologic at this point.

(Tr. 302).

On May 11, 2009, Dr. Margret Duncan authored a letter addressed to "To whom it may concern" which reads in its entirety as follows:

> This patient has severe carpal tunnel syndrome bilaterally and cervical spondylosis and myofascial neck and back pain. He will need surgery on his carpal tunnel and a referral to a pain specialist for his neck and back pain. First he needs an insurance plan that will allow this referral. He will be unable to reenter the work force until these things are completed and he has been able to recover from the surgeries. I anticipate about 6 months before he can return to working. Only after surgery will we know if the nerve damage can be fully reversible or if he will be left with some permanent nerve damage.

(Tr. 270).

On September 15, 2009, Plaintiff was examined by Dr. Duncan. (Tr. 367-69). The results of a physical examination were unremarkable. (Tr. 368). The doctor noted that Plaintiff "seems to have multiple somatic complaints," but that "his story changes frequently." (Tr. 369). The doctor further noted that "there may be some secondary gain issues with his disability and court

6

issues." (Tr. 369). On October 22, 2009, Plaintiff underwent "right cubital tunnel release" and "right open carpal tunnel release" surgeries performed by Dr. Richard Howell. (Tr. 309-11).

On December 23, 2009, Dr. Duncan authored a second letter addressed to "To whom it may concern" which reads in its entirety as follows:

> This patient has multiple medical problems for which he will require several months of investigation and recovery from surgery. I do not anticipate that he would be able to return to work for at least 3 and possibly 6 more months.

(Tr. 331).

Following a December 24, 2009 examination of Plaintiff, Dr. Duncan noted that Plaintiff "may be disability seeking." (Tr. 366-67).

On January 19, 2010, Plaintiff participated in an MRI examination of his lumbar spine the results of which revealed "no disc herniation or canal stenosis." (Tr. 357).

On March 10, 2010, Plaintiff was examined by Dr. Sean Growney. (Tr. 344). Plaintiff reported that he was experiencing "vague pain" in his neck and lower back as well as "shooting pain down his left leg." (Tr. 344). The doctor observed that recent MRI examinations of Plaintiff's cervical and lumbar spine were "surprisingly normal in appearance." (Tr. 344). The doctor further noted that "there is a great psychosocial component to his pain" and "there also might be some secondary gain issues." (Tr. 344).

On May 4, 2010, Plaintiff was examined by Dr. Steven VanDoornik. (Tr. 338-39). Plaintiff reported that he was experiencing "spinal pain and left lower extremity symptoms." (Tr.

338). An examination revealed "no Horner's sign"[2] and "negative" Romberg testing.[3] (Tr. 338-39). The doctor discerned "[n]o atrophy or fasciculations," but noted that Plaintiff exhibited "inconsistent sensory changes in his lower extremities." (Tr. 339). Plaintiff's CPK level[4] was "normal" and testing for "Stiff Person Syndrome"[5] was "negative." (Tr. 336-39).

Treatment notes dated January 5, 2011, indicate that Plaintiff "walks the dog a lot for exercise." (Tr. 380). On February 4, 2011, Plaintiff participated in an electroneuromyography examination of his upper extremities the results of which were "normal." (Tr. 386-87).

On February 8, 2011, Plaintiff was examined by Dr. Shelley Freimark. (Tr. 391-93). Plaintiff reported that he was experiencing chronic neck pain, thoracic pain, lumbar pain, arm pain, and leg pain and numbness. (Tr. 391). Plaintiff reported that he experiences "severe pain constantly" which he rated as "10 out of 10." (Tr. 391). Dr. Freimark, however, observed that Plaintiff "sits quite comfortably throughout the office visit" and "is extremely fixated on all of his symptoms." (Tr. 391). A physical examination revealed the following:

---

[2] Horner syndrome is a "rare disorder that occurs when certain nerves that travel from your brain to your eyes and face are damaged." Horner Syndrome, available at http://www.mayoclinic.com/health/horner-syndrome/DS01137 (last visited on August 28, 2013). Horner syndrome is not itself a disorder, but is instead "a sign of another medical problem - such as a stroke, tumor or spinal cord injury." *Id.*

[3] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on August 28, 2013). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

[4] CPK refers to creatine phosphokinase, an "enzyme found mainly in the heart, brain, and skeletal muscle." Creatine Phosphokinase Test, available at http://www.nlm.nih.gov/medlineplus/ency/article/003503.htm (last visited on August 28, 2013). When a muscle is damaged, CPK "leaks into the bloodstream." Thus, a high CPK level "usually means there has been injury or stress to muscle tissue, the heart, or the brain." *Id.*

[5] Stiff-person syndrome (SPS) is "a rare neurological disorder with features of an autoimmune disease." NINDS Stiff-Person Syndrome Information Page, available at http://www.ninds.nih.gov/disorders/stiffperson/stiffperson.htm (last visited on August 28, 2013). SPS is characterized by "fluctuating muscle rigidity in the trunk and limbs and a heightened sensitivity to stimuli such as noise, touch, and emotional distress, which can set off muscle spasms." *Id.*

> He has a normal affect. His gait is normal. Inspection of his lumbar and thoracic spine shows normal configuration. He does report some diffuse tenderness throughout the lumbar, thoracic and cervical paraspinal muscles. He has full range of motion of the lumbar spine to forward flexion and extension but complains of pain with both maneuvers. He has full range of motion of the lower extremities bilaterally. Straight leg raising is negative bilaterally. Patrick's maneuver[6] is negative bilaterally. All joints appear symmetric. There is no edema. Strength is 5/5 as the bilateral hip flexors, knee extensors, dorsiflexors and toe extensors.

(Tr. 392). Dr. Freimark concluded that Plaintiff's "levels of pain complaint far outweigh any objective abnormalities on his testing or physical exam." (Tr. 392). The doctor also noted that "there appears to be a significant psychosocial overlay to his continued complaints of pain." (Tr. 392). The doctor concluded that "there is really no other test or treatment that I can recommend other than he remains active and exercise." (Tr. 392).

On September 12, 2011, Dr. Duncan completed reports concerning Plaintiff's functional capacity. (Tr. 396-403). Specifically, the doctor completed a diabetes questionnaire, (Tr. 396-99), and a separate fibromyalgia questionnaire, (Tr. 400-03). The doctor reported that Plaintiff was unable to walk even one block. (Tr. 402). The doctor reported that Plaintiff could sit and stand for 20-30 minutes each. (Tr. 402). Dr. Duncan reported that during an 8-hour day, Plaintiff could stand/walk for "less than 2 hours." (Tr. 402). The doctor also reported, however, that she could not assess Plaintiff's ability to sit during an 8-hour workday. (Tr. 402). With respect to Plaintiff's ability to lift/carry or perform certain postural maneuvers, the doctor's opinion is not clear. (Tr.

---

[6] FABER (or Patrick) test is "a screening test for pathology of the hip joint or sacrum." *See* Special Tests of the Lower Extremity, available at http://physicaltherapy.about.com/od/orthopedicsandpt/ss/LEspecialtests_2.htm (last visited on September 4, 2013). The test is performed by placing the patient in the supine position and then flexing one leg and placing the foot of that leg on the opposite knee. The tested then slowly presses down on the superior aspect of the tested knee joint lowering the leg into further abduction. The motion performed as part of this test is referred to as FABER - **F**lexion, **AB**duction, **E**xternal **R**otation at the hip. The results are positive if the patient experiences "pain at the hip or sacral joint, or if the leg can not lower to point of being parallel to the opposite leg." *Id.*

403). Rather than select any of the provided boxes indicating the extent to which Plaintiff could perform such activities, the doctor instead created her own mark on the form suggesting that Plaintiff could only "rarely" or "occasionally" lift any amount of weight or perform such activities. (Tr. 403). However, the doctor also wrote in the margin of the form that Plaintiff "has full strength [and] ability to do these tasks albeit [with] reported pain." (Tr. 403). The doctor reported that Plaintiff was "incapable of even 'low stress' jobs." (Tr. 401). Dr. Duncan further observed, however, that she was "not sure" if Plaintiff was "a malingerer" and further noted that the objective medical evidence does not support Plaintiff's subjective complaints. (Tr. 399, 401).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[7] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional

---

[7] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that through the date his insured status expired, Plaintiff suffered from: (1) possible fibromyalgia; (2) diabetes mellitus; (3) status post on-the-job injury; and (4) status post carpal tunnel syndrome surgical release, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 16-17).

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of the date his insured status expired, Plaintiff retained the capacity to perform light work[8] except

---

[8] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983);

"he is limited to unskilled work with frequent bilateral grasping and no concentrated exposure to unprotected heights, moving machinery and vibrations with occasional postural activities, except no climbing of ropes, ladders or scaffolds." (Tr. 17).

The ALJ determined that Plaintiff could not perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 11,000 jobs in the lower peninsula of the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 41-42). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369,

---

*Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

        a.      The ALJ Properly Evaluated the Medical Evidence

As noted above, on several occasions Dr. Duncan expressed opinions suggesting that Plaintiff is impaired to an extent beyond that recognized by the ALJ. The ALJ accorded only limited weight to the doctor's opinions. Plaintiff argues that because Dr. Duncan was his treating physician, the ALJ was required to afford controlling weight to her opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

Twice Dr. Duncan authored brief statements addressed to "To whom it may concern," both of which are quoted in full above. As the ALJ correctly concluded, these particular opinions are simply conclusory statements that Plaintiff is unable to work which are not entitled to deference because the determination of disability is a matter left to the commissioner. *See* 20 C.F.R. § 404.1527(e)(1). (Tr. 20-21).

Dr. Duncan also completed, in September 2011, two forms regarding Plaintiff's functional capacity. As previously noted, Dr. Duncan only completed certain portions of these forms. To the extent that the doctor completed these forms, she reported that Plaintiff was more impaired than recognized by the ALJ. As the ALJ correctly concluded, however, such opinions are inconsistent with Dr. Duncan's treatment notes, (Tr. 374-89), as well as the results of numerous

examinations, objective assessments, and Plaintiff's reported activities. Moreover, Dr. Duncan did not complete the forms in question until more than two years after the expiration of Plaintiff's insured status. The doctor does not indicate in these forms the extent to which her opinions concern the period of time prior to the expiration of Plaintiff's insured status. In sum, the ALJ articulated good reasons, supported by substantial evidence, for affording less than controlling weight to Dr. Duncan's opinions.

Plaintiff makes much of an error the ALJ appears to have made regarding the two forms that Dr. Duncan completed in September 2011. As noted, Dr. Duncan completed a diabetes questionnaire, (Tr. 396-99), and a separate fibromyalgia questionnaire, (Tr. 400-03). The doctor declined to complete certain portions of the diabetes questionnaire, instead writing in the margin, "see fibromyalgia form." (Tr. 398). In her opinion, however, the ALJ stated that "no such form exists." (Tr. 21 n.1). It appears that the ALJ simply failed to realize that the pages in question constituted two separate forms rather than one single questionnaire. The Court discerns no significance in this apparent error and finds that such does not call into question the substantiality of the evidence supporting the ALJ's decision in this regard.

Plaintiff also argues that the ALJ "lacked valid reasons" to reject the opinions expressed by Dr. Wisk and Dr. Kreuzer both of whom were employed by the "MED-1" facility. (Tr. 222-63). The doctors treated Plaintiff from October 22, 2007, through January 22, 2008. Following this latter examination, Dr. Wisk reported that Plaintiff could perform work activities so long as he not lift more than 40 pounds and "limit repetitive looking up/down." (Tr. 244). The ALJ discounted this opinion on the ground that the limitations in question were only intended to be temporary, were accompanied by only "cursory explanations," and were superceded by "more recent medical

15

opinions." While the Court finds that the ALJ's rationale is supported by substantial evidence, more significantly, the Court finds that Dr. Wisk's opinion is not inconsistent with the ALJ's RFC determination. In his opinion, the ALJ limited Plaintiff to light work and only "occasional postural activities," both of which are consistent with the limitations articulated by Dr. Wisk. Thus, whether the ALJ articulated good reasons for discounting Dr. Wisk's opinion is irrelevant as such is not inconsistent with the ALJ's RFC determination. Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: September 4, 2013 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge